# <u>EXHIBIT 1</u>

**Shopping Center Lease**

THE STATE OF TENNESSEE
COUNTY OF SHELBY

This lease, entered into this **8th** day of **July** , 19 **98**, by and between the Landlord and the Tenant hereinafter named.

## ARTICLE I. Definitions and Certain Basic Provisions.

1.1  (a)  "Landlord":

    **White Station Partners, L.P.**

(b)  Landlord's address:

    **5264 Poplar Ave.**
    **Memphis, TN 38119**

(c)  "Tenant":

    **Holiday Ham and Turkey, Inc.**

(d)  Tenant's mailing address:

    **6750 Poplar Ave., Suite 107**
    **Memphis, TN 38138**

(e)  Tenant's trade name:

    **Holiday Ham and Turkey, Inc.**

(f)  Tenant's address in Shopping Center: **585 Erin Drive, Memphis TN 38119**

(g)  "Demised Premises": approximately **3,825** square feet in Building (computed from measurements to the exterior of outside walls of the building and to the center of interior walls), such premises being shown and outlined on the plan attached hereto as Exhibit A, and being part of the Shopping Center situated upon the property described in Exhibit B attached hereto.  "Shopping Center" shall refer to the property described in Exhibit B, together with such additions and other changes as Landlord may from time to time designate as included within the Shopping Center.

(h)  Lease term:  Commencing on **October 1, 1998**   and expiring **May 31, 2009**   for a term of **128 months** thereafter except that in the event the Commencement Date is a date other than the first day of a calendar month, said term shall extend for said number of months in addition to the remainder of the calendar month following the Commencement Date.

(i)  "Estimated Occupancy Date":   **October 1, 1998**

(j)  Minimum Guaranteed Rental:   **Years 1 and 2 - $5,259.38 per month, Years 3 through 5 - $5,523.94 per month, Years 6 through 8 - $5,785.31 per month, Year 9 and through the expiration date of the lease  - $6,075.38 per month.**

(k)  Initial Common Area Maintenance charge per month:   **$570.56**

(l)  Initial Insurance Escrow Payment per month:   **$70.13**

(m)  Initial Tax Escrow Payment per month:   **$411.19**

(n)  "Security Deposit": $ **6,075.38**, refundable upon the expiration **of the third lease year if Tenant has not been in default of the Lease during this period.**

(o)  Permitted use:   **Retail sale of seasonal and/or specialty Hams and Turkeys and operation of a delicatessen.**

1.2    The sum of:
    Minimum Guaranteed Rental as set forth in Article I, Section 1.1(j); and
    Initial Common Area Maintenance charge, as set forth in Article I, Section 1.1(k); and
    Initial Escrow Payment as set forth in Article I, Section 1.1(l); and
    Initial Tax Escrow Payment as set forth in Article I, Section 1.1(m)
    Initial Monthly Payment Total: **$6,311.26**

1.3    Each of the foregoing definitions and basic provisions shall be construed in conjunction with and limited by references thereto in other provisions of this lease.

## ARTICLE II. Granting Clause.

2.1    In consideration of the obligation in Tenant to pay rent and other charges as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby takes from Landlord, the Demised Premises as described in Article I, Section 1.1(g) TO HAVE AND TO HOLD said premises for the lease term specified in Article I, Section 1.1(h), all upon the terms and conditions set forth in this lease.

## ARTICLE III. Construction and Acceptance of Demised Premises.

3.1    Landlord shall proceed to construct an improvement upon the Demised Premises in compliance with the "Description of Landlord's Work" in Exhibit C attached hereto, with such **reasonable** variations as Landlord may deem advisable, and tender the premises to Tenant.  The Demised Premises shall be deemed to be "Ready for Occupancy" when Landlord certifies in writing to Tenant that Landlord has substantially completed Landlord's work, as described in Exhibit C.  If the Demised Premises are not Ready for Occupancy prior to the Estimated Completion Date, Landlord shall not be deemed to be in default hereunder or otherwise liable in damages to Tenant, nor shall the term of this lease be affected, except that if for any reason

Tenant _____ Landlord _____

the Demised Premises are not ready for occupancy within thirty days following the Estimated Completion Date, Tenant may at its option cancel and terminate this lease. If this lease is so cancelled within thirty days following the expiration of such **thirty day** period, in which event neither party shall have any further liabilities or obligations hereunder, except the Landlord shall repay to Tenant any prepaid rent or security deposit. When the Demised Premises are Ready for Occupancy, Tenant agrees to accept possession thereof and to proceed with due diligence to perform the work described under "Description of Tenant's Work" in Exhibit C, all of such work to be performed in compliance with Exhibit C, and to install its fixtures, furniture and equipment. Any Tenant Work causing venting, opening, sealing, waterproofing, or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense. Tenant shall provide Landlord with a certificate from Landlord's roofing contractor that all of Tenant's Work described in Exhibit C causing venting, opening, sealing waterproofing or in any way altering the roof has been performed in compliance with Exhibit C. Tenant hereby holds Landlord harmless from any damage to the Demised Premises resulting, directly or indirectly, from Tenant's venting, opening, sealing, waterproofing or in any other way altering the roof unless such a certificate from Landlord's roofing contractor has been delivered to Landlord before the date of any such loss. In the event of any dispute as to work performed or required to be performed by Landlord or Tenant, the certificate of Landlord's architect or engineer shall be conclusive. **Upon the completion of Landlords work, Tenant and Landlord will walk through the Premises and create a listing, if any, of the unfinished work.** Tenant further agrees that, if requested by Landlord, Tenant will furnish Landlord with a written statement that Tenant has accepted the Demised Premises and that Landlord has fully complied with Landlord's covenants and obligations hereunder. Tenant agrees to furnish to Landlord a Certificate of Occupancy from applicable local authorities upon Commencement Date.

3.2     The Commencement Date of this lease shall be **October 1, 1998**, or the date upon which Tenant opens the premises to the public for business, whichever shall first occur. Occupancy of the Demised Premises by Tenant prior to the Commencement Date shall be subject to all of the terms and provisions of this lease excepting only those requiring the payment of rent.

## ARTICLE IV. Monthly Payment

4.1     Monthly Payment, as specified in Article I, Section 1.2, shall accrue hereunder from the Commencement Date, and shall be payable at the place designated for the delivery of notices to Landlord at the time of payment, without demand and without set-off or deduction, for any reason whatsoever, except as herein provided. Monthly Payment shall mean the sum of Minimum Guaranteed Rental in monthly installments in the amount specified in Article I, Section 1.1(j), Common Area Maintenance Charge as set forth in Article V, Insurance Escrow Payment as set forth in Article XII and Tax Escrow Payment as set forth in Article XVII.

4.2     Tenant shall pay to Landlord Minimum Guaranteed Rental in monthly installments in the amount specified in Article I, Section 1.1(j) above. The first such monthly installment shall be due and payable on or before the Commencement Date, and subsequent installments shall be due and payable on or before the first day of each succeeding calendar month during the hereby lease term; provided that if the Commencement Date is a date other than the first day of a calendar month, there shall be due and payable on or before such date as minimum guaranteed rental for the balance of such calendar month a sum equal to that proportion of the rent specified for the first full calendar month as herein provided, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date shall fall bears to the total number of days in such month.

## ARTICLE V. Common Area.

5.1     The "Common Area" is the part of the Shopping Center designated by Landlord from time to time for the common use of all tenants, including among other facilities, parking area, sidewalks, landscaping, curbs, loading areas, private streets and alleys, lighting facilities, hallways, and other areas and improvements provided by Landlord for the common use of all tenants, all of which shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in its discretion, shall determine. Landlord reserves the right to change from time to time the dimensions and location of the Common Area as shown on Exhibit A as well as the location, dimensions, identity and type of any building shown on Exhibit A and to construct additional buildings or additional stories on existing buildings or other improvements in the Shopping Center, and to eliminate buildings from the plan shown on Exhibit A, **provided such does not materially or adversely affect Tenant's parking and visibility.** Tenant and its employees, customers, subtenants, licensees and concessionaires shall have the non-exclusive right and license to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants of the Shopping Center and other persons permitted by Landlord to use the same, and subject to such reasonable rules and regulations governing use as Landlord may from time to time prescribe, including the designation of specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles owned by Tenant, its employees, subtenants, licensees and concessionaires shall be parked. Tenant will furnish to Landlord upon request a complete list of license numbers of all automobiles operated by Tenant, its employees, subtenants, licensees or concessionaires. Tenant shall not solicit business or display merchandise within the Common Area, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Area without the prior written consent of the Landlord. Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations.

5.2     Landlord shall construct, at its sole cost and expense, a hard surface parking area within the Shopping Center as shown on Exhibit A or in reasonable proximity thereto, it being expressly agreed, however, that in addition to the rights reserved to Landlord in Section 5.1 above, Landlord may from time to time **temporarily** substitute for any parking area shown on Exhibit A other areas or multi-level parking facilities reasonably accessible to the tenants of the Shopping Center **for a period not to exceed 15 days for the purpose of repairs or improvement.** Certain areas have been designated by Landlord for employee parking and are more particularly described in Exhibit "A". Tenant agrees to use its best efforts to require its employees to park in these designated areas.

5.3     Tenant agrees to pay as an additional charge each month for its proportionate share of the cost of operation, maintenance and management of the Common Area (including, among other costs, those incurred for lighting, water sewerage, painting, cleaning, policing, inspecting, landscaping, repairing **and replacing of items not of a capital nature**, guarding, protecting and managing) which may be incurred by Landlord in its discretion. The proportionate share to be paid by Tenant of the cost of operation and maintenance of the Common Area shall be computed on the ratio that the total area of

Tenant _____    Landlord _____

the Demised Premises bears to the annual average number of square feet of leasable space within the Shopping Center. Landlord shall make monthly or other periodic charges based upon the estimated annual cost of operation, maintenance and management of the Common Area, payable in advance but subject to adjustment after the end of the year on the basis of the actual cost for such year. Any such periodic charges shall be due and payable upon delivery of notice thereof. The initial Common Area Maintenance Charge, subject to adjustment as provided herein, shall be that amount set out in Article I, Section 1.1(k). **In no event shall the Tenant be responsible for Common Area Maintenance cost which increase in excess of ten percent (10%) from the previous calender year.**

### ARTICLE VI: Use and Care of Premises.

6.1      The Demised Premises may be used only for the purpose or purposes specified in Article I, Section 1.1(o) above, and for no other purpose or purposes without the prior written consent of Landlord. Tenant shall use in the transaction of business in the Demised Premises the trade name specified in Article I, Section 1.1(e) above and no other trade name without the prior written consent of Landlord. Tenant shall not at any time leave the Demised Premises vacant, but shall in good faith continuously throughout the term of this lease conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises are leased. Tenant shall operate its business with a complete line of full selection and sufficient stock of first class merchandise of current style and type, attractive displays and in an efficient, high class and reputable manner so as to produce the maximum amount of sales from the Demised Premises, and shall, except during reasonable periods for repairing, cleaning and decorating keep the Demised Premises open to the public for business with adequate and competent personnel in attendance on all days and during **the following hours: Monday - Friday, 10:00 a.m. to 6:00 p.m., Saturday, 10:00 a.m. to 5:30 p.m., and hours during holidays as set in the Tenant's discretion.**

6.2      Tenant shall not, without Landlord's prior written consent, keep anything within the premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or other part of the Shopping Center. Tenant shall pay as additional rental, upon demand of Landlord, any such increased premium cost due to Tenant's use or occupation of the Demised Premises. All property kept, stored or maintained within the premises by Tenant shall be at Tenant's sole risk.

6.3      Tenant shall not conduct within the Demised Premises any fire, auction or bankruptcy sales or operate within the Demised Premises a "Wholesale" or "factory outlet" store, a cooperative store, a "second hand" store, a "surplus" store or a store commonly referred to as "discount house". Tenant shall not advertise that it sells products or services at "discount", "cut-price", or "cut-rate" prices. Tenant shall not permit any objectionable or unpleasant odors to emanate from the Demised Premises, nor place or permit any radio, television, loud-speaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from outside the building or in the Common Area, nor place an antenna, awning or other projection on the exterior of the Demised Premises; nor solicit business or distribute leaflets or other advertising material in the Common Area; nor take any other action which in the exclusive judgment of Landlord would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, nor do anything which would tend to injure the reputation of the Shopping Center.

6.4      Tenant shall take good care of the Demised Premises and keep the same free from waste at all times. Tenant shall keep the Demised Premises and sidewalks, service-ways and loading areas adjacent to the Demised Premises neat, clean and free from dirt, rubbish, insects and pests at all times, and shall store all trash and garbage within the Demised Premises, arranging for the regular pickup of such trash and garbage at Tenant's expense. Tenant will store all trash and garbage within the area designated by Landlord for such trash pickup and removal and only in receptacles of the size, design and color from time to time prescribed by Landlord. Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by Landlord. Landlord will arrange for collection of all trash and garbage, and Tenant's proportionate share of the cost thereof will be part of its Common Area Maintenance charge. Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.

6.5      Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows, exterior electric signs in front of the Demised Premises lighted from dusk until 10:00 PM every day, including Sundays and holidays.

6.6      Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

6.7      Tenant shall procure, at its sole expense, any permits and license required for the transaction of business in the Demised Premises and otherwise comply with all applicable laws, ordinances and governmental regulations.

### ARTICLE VII. Maintenance and Repair of Premises.

7.1      Landlord shall keep the foundation, the exterior walls (except plate glass windows, doors, door closure devices, window and door frames, molding, locks and hardware and painting or other treatment of interior and exterior walls) and roof of the Demised Premises in good repair, except that Landlord shall not be required to make any repairs occasioned by the act or negligence of Tenant, its agents, employees, subtenants, licensees and concessionaires, which repairs shall be made by Tenant. In the event that the Demised Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord and Landlord shall not be responsible in any way for failure to make any such repairs **within ten (10) days of written notice, unless an emergency exists.** Landlord's obligation hereunder is limited to repairs specified in this Article VII, Section 7.1 only, and Landlord shall have no liability for any damages or injury arising out of any condition or occurrence causing a need for such repairs.

7.2      Tenant shall furnish, maintain and replace all electric light bulbs, tubes , tube casings and ballasts.

7.3      Tenant shall keep the Demised Premises in good, clean condition and shall, at its sole cost and expense, make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord under the provisions of Article VII, Section 7.1 and Article XIV and shall keep all plumbing units, pipes and connections free from obstruction and protected against ice and freezing. If any repairs required to be made by Tenant hereunder are not made within ten days after written notice delivered to Tenant by Landlord, Landlord may, at its

Tenant _____ Landlord _____

option, make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs, and Tenant sha     ay to Landlord immediately upon demand     dditional rental hereunder the cost of such repairs plus ten percent (10%) of the amount thereof and failure to do so shall constitute an event of default hereunder.  At the expiration of this lease, Tenant shall surrender the Demised Premises in good condition, reasonable wear and tear and loss by fire or other casualty excepted and shall surrender all keys for the Demised Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Demised Premises.

7.4     Maintenance and repair of the air conditioning and heating equipment shall be Tenant's sole responsibility throughout the entire term of this lease, **except as provided for in Exhibit "C". If at anytime during the first lease year a air conditioning unit  needs to be replaced, based upon the mutual consensus of Tenants mechanical contractor and Landlords mechanical contractor,  then it will be at Landlords sole cost and expense. If both contractors disagree, a independent third party contractors decision will prevail.**

**ARTICLE VIII. Alterations.**

8.1     Tenant shall not make any alterations, additions or improvements **costing in excess of $5,000.00 to the Demised Premises** without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Demised Premises.  All alterations, additions, improvements and fixtures (other than unattached, movable trade fixtures) which may be made or installed by either party upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become the property of Landlord at the termination of this lease, unless Landlord requests their removal in which event Tenant shall remove the same and restore the Demised Premises to their original condition at Tenant's expense.  Any linoleum, carpeting or other floor covering which may be cemented or otherwise affixed to the floor of the Demised Premises is a permanent fixture and shall become the property of Landlord without credit or compensation to Tenant.

8.2     All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and the requirements of any contract or deed of trust to which the Landlord may be a party and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.  Tenant agrees to indemnify Landlord and hold it harmless against any loss, liability or damage resulting from such work and Tenant shall, if requested by Landlord, furnish bond or other security satisfactory to Landlord against any such loss, liability or damage.

8.3     Tenant agrees that all venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense and that when completed Tenant shall furnish to Landlord a certificate from Landlord's roofing contractor that all such alterations approved by Landlord have been completed in accordance with the plans and specifications therefor approved by Landlord.

**ARTICLE IX. Landlord's Right of Access; Use of Roof.**

9.1     Landlord shall have the right to enter upon the Demised Premises at any reasonable time for the purpose of inspecting the same, or of making repairs to the Demised Premises, or of making repairs, alterations or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, lessees or lenders.

9.2     Use of the roof above the Demised Premises is reserved to Landlord.

**ARTICLE X. Signs; Storefronts.**

10.1     Tenant shall not, without Landlord's prior written consent (a) make any changes to or paint the storefront; or (b) install any exterior lighting, decorations or paintings; or (c) erect or install any signs, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Demised Premises, excepting only dignified displays of customary type for its display windows.  All signs, decorations and advertising media shall conform in all respects to the sign criteria established by Landlord for the Shopping Center from time to time in the exercise of its sole discretion, and shall be subject to the prior written approval of Landlord as to construction, method of attachment, size, shape, height, lighting, color and general appearance.  All signs shall be kept in good condition and in proper operating order at all times.  Landlord reserves the right to designate a uniform type of sign for the Shopping Center to be installed and paid for by Tenant.

10.2     Tenant agrees to have erected and/or installed and fully operative on or before the Commencement Date of this lease all signs in accordance with Landlord's sign criteria.  The Tenant, upon vacation of the Demised Premises, or the removal or alteration of its sign for any reason, shall be responsible for the repair, painting, and/or replacement of the building fascia surface where signs are attached.

**ARTICLE XI. Utilities.**

11.1     Landlord agrees to cause to be provided and maintained the necessary mains, conduits and other facilities necessary to supply water, electricity, telephone service and sewerage service to the Demised Premises, subject to any special provisions contained in Exhibit C.

11.2     Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewerage service and other utilities furnished to the Demised Premises and shall promptly pay any maintenance charges therefor.  Landlord may, if it so elects, furnish one or more utility services to Tenant, and in such event Tenant shall purchase the use of such services as are tendered by Landlord, and shall pay on demand as additional rental the rates established therefor by Landlord which shall not exceed the rates which would be charged for the same services if furnished directly by the local public utility companies.  Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Demised Premises to the public utility, if any, furnishing such service.

11.3     Landlord shall not be liable for any interruption or failure whatsoever in utility services **unless such failure is a result of Landlords negligence.**

Tenant _____   Landlord _____

### ARTICLE XII. Indemnity, Public Liability Insurance and Fire and Extended Coverage Insurance.

12.1   **Either party** shall not be liable to **other** or to **their** employees, agents or visitors, or to any other person or entity, whomsoever, for any injury to person or damage to or loss of property on or about the Demised Premises or the Common Area caused by the negligence or misconduct of **the other**, its employees, subtenants, licensees or concessionaires, or of any other person entering the Shopping Center under the express or implied invitation of **the other**, or arising out of the use of the premises by **the other** and the conduct of its business therein, or arising out of any breach or default by **the other** in the performance of its obligations hereunder or resulting from any other cause except **the other's** negligence, and **both** hereby agrees to indemnify **each other** and hold it harmless from any loss, expense or claims arising out of such damage or injury.

12.2   Tenant shall procure and maintain throughout the term of this lease a policy or policies of insurance, at its sole cost and expense, insuring both Landlord and Tenant against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Demised Premises, or by the condition of the Demised Premises, the limits of such policy or policies to be in an amount not less than $500,000 in respect of injuries to or death of any one person, and in an amount not less than $1,000,000 in respect of any one accident or disaster, and in amount not less than $500,000 in respect of property damaged or destroyed, and to be written by insurance companies satisfactory to Landlord. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least ten days prior to cancellation of such insurance.  Such policies or duly executed certificates of insurance shall be promptly delivered to Landlord and renewals thereof as required shall be delivered to Landlord at least thirty days prior to the expiration of the respective policy terms.  Tenant's failure to comply with the foregoing requirements relating to insurance shall constitute an event of default hereunder.  In addition to the remedies provided in Article XVIII of this lease, Landlord may, but is not obligated to obtain such insurance and Tenant shall pay to Landlord upon demand as additional rental the premium cost thereof plus interest at the rate of ten percent (10%) per annum from the date of payment by Landlord until repaid by Tenant.

12.3   Landlord and Tenant agree and covenant that neither shall be liable to the other for loss arising out of damage to or destruction of the Demised Premises or contents thereof when such loss is caused by any perils included within standard fire and extended coverage insurance policy of the state in which the Demised Premises is situated; this agreement shall be binding whether or not such damage or destruction be caused by negligence of either party or their agents, employees or visitors.  Landlord agrees to carry fire and extended coverage to the extent required by its lender.

12.4   Tenant agrees to pay its proportionate share of Landlord's cost of carrying fire and extended coverage insurance ("Insurance") on the Shopping Center.  During each month of the term of this lease, Tenant shall make a monthly escrow deposit with Landlord equal to 1/12 of its proportionate share of the insurance on the Shopping Center which will be due and payable for that particular year.  Tenant authorizes Landlord to use the funds deposited by him with Landlord under this Article XII, Section 12.4 to pay cost of such Insurance.  Each Insurance Escrow Payment shall be due and payable at the same time and manner of the payment of Minimum Guaranteed Rental as provided herein.  The amount of the initial monthly Insurance Escrow Payment will be that amount set out in Article I, Section 1.1(I) above.  The initial monthly Insurance Escrow Payment is based upon Tenant's proportionate share of the estimated Insurance on the Shopping Center for the year in question, and the monthly Insurance Escrow Payment is subject to increase or decrease as determined by Landlord to reflect an accurate monthly escrow of Tenant's estimated proportionate share of the Insurance.  The Insurance Escrow Payment account of Tenant shall be reconciled annually.  If the Tenant's total Insurance Escrow Payments are less than Tenant's actual pro rata share of the Insurance on the Shopping Center, Tenant shall pay to Landlord upon demand the difference; if the total Insurance Escrow Payments of Tenant are more than Tenant's actual pro rata share of the Insurance on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's Insurance Escrow Payment account.  Tenant's proportionate share of the cost of Insurance on the Shopping Center shall be computed by multiplying the cost of Insurance by a fraction, the numerator of which shall be the number of square feet of floor space in the Demised Premises and the denominator of which shall be the average annual number of square feet of leasable space within the Shopping Center.

### ARTICLE XIII. Non-Liability for Certain Damages.

13.1   Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person or entity whomsoever for any injury to person or damage to property caused by the Demised Premises or other portions of the Shopping Center becoming out of repair or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Demised Premises, **unless such is a result of Landlords negligence**, nor shall Landlord be liable to Tenant or any other person or entity whomsoever for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord.  With respect to latent or patent defects in the Demised Premises , Landlord's liability shall not extend beyond one year from the date of substantial completion of the construction of the Demised Premises, whether or not such defects are discovered within such one-year period.  Tenant shall indemnify and hold Landlord harmless from any loss, cost, expense or claims arising out of such injury or damage referred to in this Article XIII, Section 13.1.

### ARTICLE XIV. Damage by Casualty.

14.1   Tenant shall give immediate written notice to Landlord of any damage caused to the Demised Premises by fire or other casualty.

14.2   In the event that the Demised Premises shall be damaged or destroyed by fire or other casualty insurable under standard fire and extended coverage insurance and Landlord does not elect to terminate this lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Demised Premises.  If the building in which the Demised Premises are located shall (i) be destroyed or substantially damaged by a casualty not covered by Landlord's insurance; or (ii) be destroyed or rendered untenantable to an extent in excess of fifty percent (50%) of the first floor area by a casualty covered by Landlord's insurance; or (iii) be damaged to such extent that the remaining term of this lease is not sufficient to amortize the cost of reconstruction, then Landlord may elect either to terminate this lease as

Tenant _____ Landlord _____

herein provided to rebuild and repair the Demised Premises, should Landlord elect to terminate this lease it shall give written notice of such termination within ninety days after the occurrence of such casualty. If Landlord should not elect to terminate this lease, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Demised Premises.

14.3     Landlord's obligation to rebuild and repair under this Article XIV shall in any event be limited to restoring Landlord's Work as described in Exhibit C to substantially the condition which the same existed prior to the casualty, and shall be further limited to the extent of the insurance proceeds available to Landlord for such restoration, and Tenant agrees that promptly after completion of such work by Landlord, it will proceed with reasonable diligence and at its sole cost and expense to rebuild, repair and restore its signs, fixtures, equipment and the other items of Tenant's Work as described in Exhibit C.

14.4     Tenant agrees that during any period of reconstruction or repair of the Demised Premises it will continue the operation of its business within the Demised Premises to the extent practicable. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Minimum Guaranteed Rental shall be reduced to such extent as may be fair and reasonable under the circumstances.

### ARTICLE XV. Eminent Domain.

15.1     If more than twenty percent (20%) of the floor area of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this lease shall terminate and the rent shall be abated during the unexpired portion of this lease, effective on the date physical possession is taken by the condemning authority.

15.2     If less than twenty percent (20%) of the floor area of the Demised Premises should be taken as aforesaid, this lease shall not terminate; however, the Minimum Guaranteed Rental payable hereunder during the unexpired portion of this lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority. Following such partial taking, Landlord shall make all necessary repairs or alterations within the scope of Landlord's Work as described in Exhibit C necessary to make the Demised Premises an architectural whole.

15.3     If any part of the Common Area shall be taken as aforesaid, this lease shall not terminate, nor shall the rental payable hereunder be reduced, except that either Landlord or Tenant may terminate this lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center shall be less than seventy percent (70%) of the area of the Common Area immediately prior to the taking. Any election to terminate this lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party within thirty days after the date physical possession is taken by the condemning authority.

15.4     All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises or Common Area shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property if a separate award for such items is made to Tenant.

### ARTICLE XVI. Assignment and Subletting.

16.1     Tenant shall not assign or in any manner transfer this lease or any estate or interest therein, or sublet the Demised Premises or any part thereof, or grant any license, concession or other right to occupy any portion of the Demised Premises without the prior written consent of Landlord, **said consent shall not be unreasonably withheld.** Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings. Notwithstanding any assignment or subletting Tenant and any guarantor of Tenant's obligations under this lease shall at all times remain fully responsible and liable for the payment of the rental herein specified and for compliance with all of its other obligations under this lease. In the event that the rental due and payable by a sublessee (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this lease, or if with respect to a permitted assignment, permitted license or other transfer to Tenant by Landlord, the consideration payable to Tenant by the assignee, licensee, or other transferee exceeds the rental payable under this lease, then Tenant shall be bound and obligated to pay Landlord all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, licensee, or other transferee, as the case may be.

16.2     In the event of the transfer and assignment by Landlord of its interest in this lease and in the building containing the Demised Premises to a person expressly assuming Landlord's obligations under this lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

16.3     Tenant shall not mortgage, pledge or otherwise encumber its interest in this lease or in the Demised Premises.

### ARTICLE XVII. Property Taxes.

17.1     Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Demised Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property and trade fixtures placed by Tenant in the Demised Premises and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

17.2     Tenant agrees to pay its proportionate share of all taxes, assessments and governmental charges of any kind and nature whatsoever (hereinafter collectively referred to as the "Taxes"), levied or assessed against the Shopping Center. During each month of the term of this lease, Tenant shall make a monthly escrow deposit with Landlord equal to 1/12 of its proportionate share of the Taxes on the Shopping Center which will be due and payable for that particular year. Tenant

Tenant _____   Landlord _____

authorized Landlord to use the funds deposited by him with Landlord under Article XVII, Section 17.2 to pay the Taxes levied or assessed against the Shopping Center. Such Tax Escrow Payment shall be due and payable at the same time and in the same manner of the payment of Minimum Guaranteed Rental as provided herein.  The amount of the initial monthly Tax Escrow Payment will be that amount set out in Article I, Section 1.1(m) above.  The initial monthly Tax Escrow Payment is based upon Tenant's proportionate share of the estimated taxes on the Shopping Center for the year in question, and the monthly Tax Escrow Payment is subject to increase or decrease as determined by Landlord to reflect an accurate escrow of Tenant's estimated proportionate share of the Taxes.  The Tax Escrow Payment account of Tenant shall be reconciled annually.  If the Tenant's total Tax Escrow Payments are less than Tenant's actual pro rata share of the Taxes on the Shopping Center, Tenant shall pay to Landlord upon demand the difference; if the total Tax Escrow Payments of Tenant are more than Tenant's actual pro rata share of the Taxes on the Shopping Center, Landlord shall retain such excess and credit it to Tenant's Tax Escrow Payment account.  Tenant's proportionate share of the Taxes on the Shopping Center shall be computed by multiplying the Taxes by a fraction, the numerator of which shall be the number of square feet of floor space in the Demised Premises and the denominator of which shall be the average annual number of square feet of leasable space within the Shopping Center.

17.3    If Tenant should fail to pay any taxes, assessments, or governmental charges required to be paid by Tenant hereunder, in addition to any other remedies provided herein, Landlord may, if it so elects, pay such taxes, assessments, and governmental charges.  Any sums so paid by Landlord shall be deemed to be so much additional rental owing by Tenant to Landlord and due and payable upon demand as additional rental plus interest at the rate of eighteen percent (18%) per annum from the date of payment by Landlord until repaid by Tenant.

17.4    (a) If at any time during the term of this lease, the present method of taxation shall be changed so that in lieu of the whole or any part of any taxes, assessments, levies or charges levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents or the present or any future building or buildings on the Shopping Center, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be deemed to be included within the term "Taxes" for the purpose hereof.

(b) Tenant may, alone or along with any other tenants of said building, at its or their sole cost and expense, in its or their own name(s) dispute and contest any "Taxes" by appropriate proceedings  diligently conducted in good faith, but only after Tenant and all other tenants, if any, joining with Tenant in such contest have deposited with Landlord the amount so contested and unpaid, or their proportionate shares thereof as the case may be, which shall be held by Landlord without obligation for interest until the termination of the proceedings at which time the amount(s) deposited shall be applied by Landlord toward the payment of the items held valid (plus any court costs, interest, penalties and other liabilities associated with the proceedings), and Tenant's share of any excess shall be returned to Tenant.  Tenant further agrees to pay to Landlord upon demand Tenant's share (as among all tenants who participated in the contest) of all court costs, interest, penalties and other liabilities relating to such proceedings.  Tenant hereby indemnifies and agrees to hold harmless the Landlord from and against any cost, damage or expense (including attorneys' fees) in connection with any such proceedings.

(c) Any payment to be made pursuant to this Article XVII with respect to the real estate tax year in which this lease commences or terminates shall bear the same ratio to the payment which would be required to be made for the full tax year as that part of such tax year covered by the term of this lease bears to a full tax year.

## ARTICLE XVIII. Default by Tenant and Remedies.

18.1    The following events shall be deemed to be events of default by Tenant under this lease:

(1) Tenant shall fail to pay any installment of rental or any other expense demanded by Landlord as herein provided and such failure shall continue for a period of ten days **after written notice**.

(2) Tenant shall fail to comply with any term, provision or covenant of this lease, other than the payment of rental or expenses demanded by Landlord and shall not cure such failure within **thirty** days after written notice thereof to Tenant.

(3) Tenant or any guarantor of Tenant's obligations under this lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(4) Tenant or any guarantor of Tenant's obligations under this lease shall file a petition under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or stature of the United States or any State thereof; or Tenant or any guarantor of Tenant's obligations under this lease shall be adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligations under this lease.

(5) A receiver or Trustee shall be appointed for all Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligations under this lease.

(6) Tenant shall desert or vacate the Demised Premises.

(7) Tenant shall do or permit to be done anything which creates a lien upon the Demised Premises.

(8) The Business operated by Tenant shall be closed for failure to pay any State sales tax as required or for any other reason.

Upon the occurrence of any such events of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

Tenant _____ Landlord _____

Tenant fails to do so, Landlord may immediately surrender the Demised Premises to Landlord, and if arrearages in rental, enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor.

B.  Enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor with or without having terminated the lease.

C.  Enter upon the Demised Premises by force if necessary without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this lease, and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to the Tenant from such action.

D.  Alter all locks and other security devices at the Demised Premises without terminating this lease.

18.2   Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Demised Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No such alteration of locks or other security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Demised Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any event of default, to the aforesaid exercise of dominion over Tenant's property within the Demised Premises. All claims for damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise.

18.3   In the event Landlord elects to terminate the lease by reason of an event of default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein the sum of all rental and other indebtedness accrued to date of such termination.

18.4   In the event that Landlord elects to repossess the Demised Premises without terminating the lease, then Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein all rental and other indebtedness accrued to the date of such repossession. In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the rental herein reserved. Actions to collect amounts due by Tenant to Landlord as provided in this Article XVIII, Section 18.5 may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the lease term.

18.5   In case of any event of default or breach by Tenant, Tenant shall also be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein, the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Demised Premises into its original condition, and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorneys' fees which shall be not less than ten percent (10%) of all sums then owing by Tenant to Landlord.

18.6   In the event of termination or repossession of the Demised Premises for an event of default, Landlord shall not have any obligation to relet or attempt to relet the premises, or any portion thereof, or to collect rental after reletting; and in the event of reletting, Landlord may relet the whole or any portion of the Demised Premises for any period, to any tenant, and for any use and purpose.

18.7   If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Demised Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees to, pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in taking such remedial action.

18.8   Upon receipt from Tenant of the sum stated in Article I, Section 1.1(n) above, such sum shall be held by Landlord without interest as security for the performance by Tenant of Tenant's covenants and obligations under this lease, it being expressly understood that such deposit is not an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Said deposit shall be held by Landlord without payment of interest, as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this lease by said Tenant to be kept and performed during the term hereof. If at any time during the term of this lease any of the rental herein reserved shall be overdue and unpaid, or any other sum payable by Tenant to Landlord hereunder shall be overdue and unpaid then Landlord may, at the option of the Landlord (but Landlord shall not be required to) appropriate and apply any portion of said deposit to the payment of any such overdue rental or other sum. In the event of the failure of Tenant to keep and perform any of the terms, covenants and conditions of this lease to be kept and performed by Tenant, then the Landlord at its option may appropriate and apply the security deposit, or so much thereof as may be necessary, to compensate the Landlord for loss or damage sustained or suffered by Landlord due to such breach on the part of Tenant. Should the security deposit, or any portion thereof be appropriated and applied by Landlord for the payment of overdue rental or other sums due and payable to Landlord by Tenant hereunder, then Tenant shall, upon the written demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore the security deposit to the original sum deposited, and Tenant's failure to do so within five days after receipt of such demand shall constitute a default under this lease. Should Tenant comply with all of the terms, covenants and conditions of this lease and promptly pay all of the rental herein provided for as it falls due, and all other sums payable by Tenant to Landlord hereunder, the security deposit shall be returned in full to Tenant at the end of the term of this lease, or upon the earlier termination of this lease.

Tenant _____  Landlord _____

such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty days in which to cure any such default.  Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof.  All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of the Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

Notwithstanding any other provision hereof, Landlord shall not have any personal liability hereunder.  In the event of any breach or default by Landlord in any term or provision of this lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the land and improvements which constitute the Shopping Center; however, in no event, shall any deficiency judgment or any money judgment of any kind be sought or obtained against any party Landlord.

18.10   In the event that Landlord shall have taken possession of the Demised Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Demised Premises, including that which is owned by or leased to Tenant at all times prior to any foreclosure thereon by Landlord or repossession thereof by a lessor thereof or third party having a lien thereon.  Landlord shall also have the right to remove from the Demised Premises (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the County in which the Demised Premises is located; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal and storage and shall indemnify and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal and storage.  Landlord shall also have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument represented to Landlord by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of the Landlord to inquire into the authenticity of said instrument's copy of Tenant's or Tenant's predecessor's signature thereon and without the necessity of Landlord's making any nature of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act; and Tenant agrees to indemnify and hold Landlord harmless from all cost, expense, loss, damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant.  The rights of Landlord herein stated shall be in addition to any and all other rights which Landlord has or may hereafter have at law or in equity; and Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

**ARTICLE XIX. Landlord's Lien.**

19.1    TO SECURE THE PAYMENT OF ALL RENTAL AND OTHER SUMS OF MONEY DUE AND TO BECOME DUE HEREUNDER AND THE FAITHFUL PERFORMANCE OF THIS LEASE BY TENANT, TENANT HEREBY GIVES TO LANDLORD AN EXPRESS FIRST AND PRIOR CONTRACT LIEN AND SECURITY INTEREST ON ALL PROPERTY (INCLUDING FIXTURES, EQUIPMENT, CHATTELS AND MERCHANDISE) WHICH MAY BE PLACED IN THE DEMISED PREMISES, AND ALSO UPON ALL PROCEEDS OF ANY INSURANCE WHICH MAY ACCRUE TO TENANT BY REASON OF DESTRUCTION OF OR DAMAGE TO ANY SUCH PROPERTY.  SUCH PROPERTY SHALL NOT BE REMOVED THEREFROM WITHOUT THE WRITTEN CONSENT OF LANDLORD UNTIL ALL ARREARAGES IN RENTAL AND OTHER SUMS OF MONEY THEN DUE TO LANDLORD HEREUNDER SHALL FIRST HAVE BEEN PAID.  ALL EXEMPTION LAWS ARE HEREBY WAIVED IN FAVOR OF SAID LIEN AND SECURITY INTEREST.  THIS LIEN AND SECURITY INTEREST IS GIVEN IN ADDITION TO THE LANDLORD'S STATUTORY LIEN AND SHALL BE CUMULATIVE THERETO.  UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, THIS LIEN MAY BE FORECLOSED WITH OR WITHOUT COURT PROCEEDINGS BY PUBLIC OR PRIVATE SALE, PROVIDED LANDLORD GIVES TENANT AT LEAST FIFTEEN DAYS NOTICE OF THE TIME AND PLACE OF SAID SALE AND LANDLORD SHALL HAVE THE RIGHT TO BECOME THE PURCHASER, UPON BEING THE HIGHEST BIDDER AT SUCH SALE.  CONTEMPORANEOUS WITH THE EXECUTION OF THIS LEASE (AND IF REQUESTS HEREAFTER BY LANDLORD), TENANT SHALL EXECUTE AND DELIVER TO LANDLORD UNIFORM COMMERCIAL CODE FINANCING STATEMENTS IN SUFFICIENT FORM SO THAT WHEN PROPERTY FILED THE SECURITY INTEREST HEREBY GIVEN SHALL THEREUPON BE PERFECTED.  IF REQUESTED HEREAFTER BY LANDLORD, TENANT SHALL ALSO EXECUTE AND DELIVER TO LANDLORD UNIFORM COMMERCIAL CODE FINANCING STATEMENT CHANGE INSTRUMENTS IN SUFFICIENT FORM TO REFLECT ANY PROPER AMENDMENT OF MODIFICATION IN OR EXTENSION OF THE AFORESAID CONTRACT LIEN AND SECURITY INTEREST HEREBY GRANTED.  LANDLORD SHALL, IN ADDITION TO ALL OF ITS RIGHTS HEREUNDER, ALSO HAVE ALL OF THE RIGHTS AND REMEDIES OF A SECURED PARTY UNDER THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE STATE IN WHICH THE DEMISED PREMISES IS LOCATED.

**ARTICLE XX. Holding Over.**

20.1     In the event Tenant remains in possession of the Demised Premises after the expiration of this lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month at a rental equal to the rental herein provided plus one hundred percent (100%) of such amount and otherwise subject to all the conditions, provisions and obligations of this lease insofar as the same are applicable to a month to month tenancy. **If Tenant remains in possession of the Demised Premise and is diligently working with the Landlord to negotiate a renewal of the Lease, then the hereinabove penalty will be waived for a period not to exceed ninety (90) days.**

**ARTICLE XXI. Subordination.**



Tenant _____ Landlord _____

21.1    hereafter created upon the Demised Premises and/or the Shopping Center, or any mortgage, deed of trust or other lien presently existing or hereafter created upon the Demised Premises and/or the Shopping Center, and any renewals and extensions thereof, but Tenant agrees that any such mortgage shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this lease. Landlord is hereby irrevocably vested with full power and authority to subordinate this lease to any mortgage, deed of trust or other lien hereafter placed upon the Demised Premises or the Shopping Center, and Tenant agrees upon demand to execute such further instruments subordinating this lease as Landlord may request. **Notwithstanding the above subordination clause, Tenant's possession of the Demised Premises shall not be disturbed by any mortgagee provided Tenant is not in default of any terms of this Lease.**

## ARTICLE XXII. Merchant's Association.

22.1    In the event that Landlord shall organize a merchants association and/or marketing fund composed of tenants in the Shopping Center, Tenant agrees that it will join, actively participate and maintain current membership in such association, will pay such dues and assessments as may be fixed and determined from time to time by the association and will comply with such group advertising reasonable bylaws, rules and regulations as may be adopted from time to time by the association.

## ARTICLE XXIII. Notices.

23.1    Wherever any notice is required or permitted hereunder, such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States mail, postage prepaid, Certified or Registered Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses set out in Article I, Section 1.1 above, or at such other addresses as they may have hereafter specified by written notice.

23.2    If and when included within the term "Landlord" as used in this instrument there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant" as used in this instrument there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payments to Tenant. All parties included with terms "Landlord" and "Tenant", respectively, shall be bound by notices and payments given in accordance with the provisions of this Article to the same effect as if each had received such notice or payment.

## ARTICLE XXIV. Late Charges.

24.1    In the event Tenant fails to pay to Landlord when due any installment of rental or other sum to be paid to Landlord which may become due hereunder, Landlord will incur additional expenses in an amount not readily ascertainable and which has not been elsewhere provided for between Landlord and Tenant. If Tenant should fail to pay to Landlord when due any installment of rental or other sum to be paid hereunder, Tenant will pay Landlord on demand a late charge of five percent (5%) thereof. Failure to pay such late charge upon demand therefor shall be an event of default hereunder. Provision for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner.

## ARTICLE XXV. Direction of Tenant's Energies.

25.1    **This section has been intentionally deleted.**

## ARTICLE XXVI. Miscellaneous.

26.1    Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between parties hereof, it being understood and agreed that neither the method of computation of rental, nor any provisions contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

26.2    The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

26.3    One or more waivers of any covenant, term or condition of this lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

26.4    Whenever a period of time is herein prescribed for action to be taken by Landlord **and Tenant**, Landlord **and Tenant** shall not be liable or responsible for and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord **and Tenant**. At any time when there is outstanding a mortgage, deed of trust or similar security instrument covering Landlord's interest in the Demised Premises, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed.

26.5    Landlord agrees that if Tenant shall perform all of the covenants and agreements, herein required to be performed by Tenant, Tenant shall, subject to the terms of this lease, at all times during the continuance of this lease have the peaceable and quiet enjoyment and possession of the Demised Premises.

Tenant _____ Landlord _____

26.6 This lease contains the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.

26.7 **This section has been intentionally deleted.**

26.8 Tenant agrees that it will from time to time, upon request by Landlord, execute and deliver to Landlord within **ten** days after demand therefor an Estoppel Certificate in Landlord's form certifying that this lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified).

26.9 The laws of the State in which the Demised Premises is located shall govern the interpretation, validity, performance and enforcement of this lease. If any provision of this lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this lease shall not be affected thereby.

26.10 The terms, provisions and covenants contained in this lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

26.11 In order to induce Landlord to execute this lease, Tenant agrees that Landlord may, at its option, at the time of the execution of this lease or at any time during the term hereof, require a guaranty of the obligations of the Tenant hereunder by a person, firm or corporation other than Tenant, acceptable to Landlord which guaranty shall be in a form satisfactory to Landlord.

26.12 Landlord may deliver the security deposit hereunder by Tenant to a purchaser of Landlord's interest in the Demised Premises, in the event that such interest be sold and thereupon Landlord shall be discharged from any further liability with respect to such deposit.

### ARTICLE XXVII. Hazardous Waste.

27.1 The term "Hazardous Substances", as used in this lease shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required or the use of which is restricted, prohibited or penalized by any "Environmental Law", which term shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment. Tenant hereby agrees that (i) no activity will be conducted on the premises that will produce any Hazardous Substance, except for such activities that are part of the ordinary course of Tenant's business (the "Permitted Activities") provided said Permitted Activities are conducted in accordance with all Environment Laws and have been approved in advance in writing by Landlord; (ii) the premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Tenant's business (the "Permitted Materials") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws and approved in advance in writing by Landlord; (iii) no portion of the premises will be used as a landfill or a dump; (iv) Tenant will not install any underground tanks of any type; (v) Tenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute a public or private nuisance; (vi) Tenant will not permit any Hazardous Substances to be brought onto the premises, except for the Permitted Materials described below, and if so brought or found located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws. If at any time during or after the term of the lease, the premises is found to be so contaminated or subject to said conditions, Tenant agrees to indemnify and hold Landlord harmless from all claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from or as a result of the use of the premises by Tenant. **Landlord warrants to the best of its knowledge that there are no Hazardous Substances currently existing on the Demised Premises.** The foregoing indemnification shall survive the termination or expiration of this Lease. Permitted Materials shall be defined and specifically limited to the following:

_____

_____

_____

DATED this _8th_ day of _July_, 19 _98_.

WITNESS

_____          **LANDLORD: White Station Partners, L.P.**

_Mark Traylor_                            _[signature]_
                                          **BY: Louis Loeb,**
                                          **Secretary/Treasurer of Loeb Realty Co.,Inc.**
                                          **General Partner**

WITNESS

_____          **TENANT: Holiday Ham and Turkey, Inc.**

_Janice Johnston_                         _Trey Jordan_
                                          **BY: Trey Jordan, President**
                                          _Lucius D. Jordan III_
                                          **Lucius D. Jordan III**

                                          Tenant _[initials]_ Landlord _[initials]_

RIDER
to that certain Lease, by and between,
White Station Partners, L.P.
and Holiday Ham and Turkey, Inc.

1.) The Landlord shall use its best efforts to deliver a "plain vanilla box" as defined in
Exhibit "C" to Tenant by July 15, 1998 .

2.) Tenant shall have the option to extend the term of the lease for an additional Five (5)
years, if not in default of the Lease at that time, by providing Landlord six (6)
months advance written notice of its intent. The term of the extended period will
commence immediately upon the expiration of the existing term under the same terms
and conditions as the Lease. The Minimum Guaranteed Rental for years 1 and 2 of
the first extended term shall be $6,075.38 per month. Years 3 through 5 of the
extended term the Minimum Guaranteed Rental shall increase to $ 6,375.00 per
month. Tenant shall have the second option to extend the term of the Lease, only if
they have exercised the first option and have not defaulted under the terms of the
Lease, for a second Five (5) year period by providing Landlord six (6) months
advance written notice of their intent to exercise the second option.. The second
extended term will commence immediately upon the expiration of the first extended
term and for the same terms and conditions except the Minimum Guaranteed Rental
shall increase to $6,693.75 per month.

3.) Tenant shall have the exclusive right to sell Seasonal/Specialty Hams and Turkeys in
the shopping center. Landlord further warrants that it will not lease space within the
center to another tenant that operates essentially as a "Deli".

4.) Tenant shall have during the term of the Lease, and any extensions or renewals, the
First Right of Refusal on the space known as 4872 Poplar Ave. containing
approximately 3,040 square feet of space for a Five (5) year lease term, as is. Tenant
shall have five (5) business days after written notice from Landlord to exercise this
option or the right passes forever. The rental rate for the space shall be determined by
the greater of either A. or B. hereinbelow;

A.) The rental rate shall be $20.00 per square foot per year if the Right of First
Refusal is exercised and the new lease commences prior to December 31, 2001.
B.) If the new lease commences after December 31, 2001, then the rental rate will be
increased by the Consumer Price Index percentage increase over a December
2001 base.

5.) Landlord shall erect a temporary marketing sign for use by all the Tenants in the
center. Landlord will establish reasonable rules and regulations concerning the type
and style of the signs/banners to be displayed on the sign. Tenant shall have the right
to display it's marketing sign/banner during the following periods:
1.) Two week period prior to Christmas Day.
2.) Two week period prior to Thanksgiving Day.
3.) Two week period prior to Easter.
4.) Two week period prior to Memorial Day.

6.) Tenant shall have the right, with Landlords prior written approval, to install an
outside seating and eating area. Tenant shall be solely responsible for all maintenance
and repairs in regards to this area. Tenant shall be responsible for all governmental
approvals and meeting all ordinances, existing or that may be created in the future, in
regard to the outdoor eating area.

"EXHIBIT A"





VICINITY MAP

| ADDRESS | TENANT | SF |
|---|---|---|
| 4840 POPLAR | NORRIS HEALTH FOODS | 2,317 |
| 4856 POPLAR | ATLANTA'S | 2,877 |
| 4858 POPLAR | FRATIER CORNER | 3,020 |
| 4860 POPLAR | FRANK GRAY'S FLOWERS | 3,000 |
| 4864 POPLAR | BALLEW INC | 3,420 |
| 4870 POPLAR | GUY'S FORTAL WEAR | 1,540 |
| 4872 POPLAR | LOVELL HAYES | 3,040 |
| 599 ERIN | | 1,480 |
| 597 ERIN | BODY SHOP TANNING | 1,500 |
| 585-579 ERIN | FLEET FEET | 6,620 |
| 575 ERIN | VACANT | 1,475 |
| 571 ERIN | LANDAU UNIFORMS | 1,968 |
| 569 ERIN | VACANT | 1,100 |
| 565 ERIN | COFING ATTRACTIONS | 4,275 |
| 561 ERIN | LULU GRILLE | 2,212 |
| 559 ERIN | MEMPHIS PHOTO SHOP | 1,800 |
| 557 ERIN | DOLL CLOSET / MICHAEL'S HAIR DESIGNS | 3,600 |
| TOTAL SF | | 45,249 |

LOEB INDUSTRIES INC
5264 Poplar Avenue
Memphis TN 38119
901 761 3333

WHITE STATION PLAZA
Memphis TN

DENTON ARCHITECTURE

WSPSITE.DWG    09MAR98

## EXHIBIT "C"

Landlord shall perform the below described work at its sole cost and expense.

1.) Existing interior walls will be demolished to provide an open shell space.

2.) A finished suspended ceiling with 2 x 4 lay in acoustical tile and 2 x 4 lay in lights at a ratio of 1 fixture per 80 square feet.

3.) Provide two (2) ADA restrooms at the rear of the Premises.

4.) Have existing HVAC system inspected to assure it is in good working order and repair and to warranty it for a period of ninety (90) days after Tenant takes possession of the space.

5.) Provide an electrical panel supplying 400 amps of service.

6.) Provide a smooth concrete floor.

# ERINWAY PARTNERS, L.P.
# AMENDMENT TO LEASE

Whereas, **ErinWay Partners, L.P., as successor in interest to White Station Partners, L.P.,** as Landlord, and **Holiday Ham and Turkey, Inc.,** as Tenant, did enter into a Lease dated **July 8, 1998** for approximately **3,825** square feet of space located at **585 Erin Drive**; Memphis, Tennessee, and

Whereas, both Landlord and Tenant desire to change and modify the Lease for the mutual benefit of both parties, Landlord and Tenant agree to make the following changes and modifications to the lease:

1. **Demised Premises:**   The Demised Premises shall be expanded to include an additional 197 square feet as described in Exhibit "D". Article 1(g) of the Lease will be amended to include the new square footage totaling 4,022.

2. **Commencement Date:**   The commencement date of this Agreement is August 1, 2004, with an expiration date of May 31, 2009.

3. **Construction and Acceptance of Demised Premises:**   Landlord agrees to allow Tenant to construct the expansion area in accordance with Exhibit "D". Upon execution of this Agreement Tenant shall proceed to construct and improve the Demised Premises in accordance with Exhibit "D". Any changes to Exhibit "D" require Landlords consent. Tenant agrees to have Demised Premises substantially completed by the Commencement Date.

4. **Expansion Improvement Allowance:**   Landlord shall provide an Expansion Improvement Allowance of $30,000.00. This allowance includes architect fees in an amount not to exceed $1,000 and general construction to the Expansion Area outlined on Exhibit "D". No extensions or renewals shall cause the Expansion Improvement Allowance to be paid again unless agreed to in writing by the parties herein.

5. **Interior Improvement Allowance:**   Landlord shall provide to Tenant an interior space allowance of $3,414.00. No extensions or renewals shall cause the ~~Allance~~ to be paid again. *Allowance to*

6. **Minimum Guaranteed Rental:**   Upon Commencement of this Amendment , the Minimum Guaranteed Rental as described and set forth in Article 1 (j) of the Lease will be amended as follows:

   August 1, 2004 through September 30, 2006      $6,083.28/month
   October 1, 2006 through May 31, 2009            $6,388.28/month

**OTHER TERMS AND CONDITIONS**: All other terms and conditions as set forth in the Lease will remain in full force and effect, and no other changes to the Lease, except as set forth above are agreed to by Landlord and Tenant.

**This Amendment to the lease will become effective when signed by all parties below.**

Accepted and Agreed to by both Landlord and Tenant this _27th_ day of _May_, 2004.


**LANDLORD:** ErinWay Partners, L.P.              **TENANT:** Holiday Ham and Turkey, Inc.

By: _____                    By: _____
   **Louis Loeb, Secretary/Treasurer**
   **Loeb Realty Co., Inc., General Partner**      **Title:** _____

## Exhibit D – Expansion Area



**Complete set of approved plans produced by Fleming Associates Architects, signed and dated April 15, 2003 by Michael Streckert for 585 Erin Drive**
**Approved by Loeb Properties on 5/18/04, attached hereto.**

**Page 1 of 8**

# ERINWAY PARTNERS, L.P.

# SECOND AMENDMENT TO LEASE

Whereas, **ErinWay Partners, L.P.,** as successor in interest to **White Station Partners, L.P.,** as Landlord, and **Holiday Ham and Turkey, Inc.,** as Tenant, did enter into a lease dated **July 8, 1998, as amended,** for approximately **4,022 (originally 3,825)** square feet of space located at **585 Erin Drive**, Memphis, Tennessee, and

Whereas, both Landlord and Tenant desire to change and modify the lease for the mutual benefit of both parties, Landlord and Tenant agree to make the following changes and modifications to the lease:

1. **DEMISED PREMISES:**   The Demised Premises shall be expanded to include an approximate 820 additional square feet* ("Expansion Area") for a new total of 4,842 square feet.

    * Upon completion of Tenant's Work, Landlord will compute the exact rentable square footage of the Expansion Area and will provide Tenant with documentation of same.

2. **TERM:**   The term of the Expansion Area shall run co-terminously with the Lease and shall expire on May 31, 2009.

3. **MINIMUM GUARANTEED RENTAL:**   Upon execution of this Second Amendment to Lease, the Minimum Guaranteed Rental for the Expansion Area shall be $19.00 per rentable square foot, which shall be blended with the Minimum Guaranteed Rental of the original Demised Premises for a new Minimum Guaranteed Rental of $19.05 per square foot ($7,686.68/month approx.*).

4. **RENTAL DEFERRMENT:**   Upon execution of this Second Amendment to Lease, the initial two (2) monthly installments of Minimum Guaranteed Rental for the Expansion Area (THE "ABATEMENT PERIOD") shall be deferred until the expiration of the current Lease Term at which time, if Tenant is never in default, said Minimum Guaranteed Rental for the Abatement Period shall be abated.   In the event Tenant defaults in performance of the covenants, conditions and requirements of the Lease, such deferred Rental shall immediately become due and payable and shall be included in the computation of Landlord's damages. Tenant shall remain responsible for the payment of Common Area Maintenance, Real Estate Tax and Insurance during the Abatement Period.

5. **OPERATING EXPENSES:**   Upon execution of this Second Amendment to Lease, Tenant's monthly estimated charges for common area maintenance, real estate taxes and insurance shall be amended to the following:

| | |
|---|---|
| Common Area Maintenance: | $1,053.00 |
| Real Estate Taxes | $1,590.00 |
| Insurance | $  105.00 |

6. **LANDLORD'S WORK:**   By occupying the Expansion Area, Tenant shall be deemed to have accepted the same "AS IS" and suitable for the purpose intended, without representation or warranty of any kind by Landlord, and to have acknowledged that the same fully comply with Landlord's covenants and obligations.

7. **TENANT'S WORK:**   Tenant shall construct a fire-rated demising wall in the Expansion Area approximately ten (10) feet north of the existing demising wall and will construct all

applicable finishes on its side of the new demising wall.  Landlord will provide Tenant an Allowance of $5,000.00 for such work, subject to Exhibit A, attached hereto.

        8. **OTHER TERMS AND CONDITIONS**:   All other terms and conditions as set forth in the Lease will remain in full force and effect, and no other changes to the Lease, except as set forth above are agreed to by Landlord and Tenant.

**This Amendment to the lease will become effective when signed by all parties below.**

Accepted and Agreed to by both Landlord and Tenant this __29__ day of __August__, 2006.

**LANDLORD:  ErinWay Partners, L.P.**

**By:  Loeb Realty Co., Inc., General Partner**

**By:** _____
    **Louis Loeb, Secretary/Treasurer**

**TENANT:  Holiday Ham and Turkey, Inc.**

**By:** _____

**Name:** _Lucius D. Jordan_

**Title:** _President_

## EXHIBIT A

(a)     Upon execution of this Second Amendment to Lease, Tenant agrees to accept possession the Expansion Area and to proceed with due diligence to perform Tenant's Work, and to install its fixtures, furniture and equipment. Any Tenant's Work causing venting, opening, sealing, waterproofing, or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense. Tenant shall provide Landlord with a certificate from Landlord's roofing contractor that all of Tenant's Work causing venting, opening, sealing, waterproofing or in any way altering the roof has been performed in compliance with Landlord's roof warranty. Tenant hereby holds Landlord harmless from any damage to the Demised Premises resulting, directly or indirectly, from Tenant's venting, opening, sealing, waterproofing or in any other way altering the roof unless such a certificate from Landlord's roofing contractor has been delivered to Landlord before the date of any such loss. In the event of any dispute as to work performed by Landlord or Tenant, the certificate of Landlord's architect or engineer shall be conclusive.

(b)     It is agreed and understood Landlord will furnish to Tenant a finish allowance of **$5,000.00** ("Allowance") for the completion of the Tenant's Work in the Demised Premises. To the extent that the actual cost of such construction of the Tenant's Work is less than such Allowance, Tenant shall have no right or claim to any difference between such actual costs and such Allowance. If the actual cost of Tenant's Work is in excess of the Allowance, then Tenant shall pay its contractor(s) and/or subcontractor(s) performing such work for such excess.

(c)     All Plans and Specifications for Tenant's Work must be approved by Landlord in writing prior to the commencement of construction. All work performed by or on behalf of Tenant shall be performed in conformance with such approved Plans and Specifications in a good and workmanlike manner and in compliance with all applicable laws, rules, codes, ordinances and regulations. Tenant, at Tenant's sole cost and expense, shall obtain all permits required prior to commencement of any construction.

(d)     Tenant shall provide Landlord with a complete list of contractors and subcontractors who will be performing work in or on the Demised Premises on behalf of Tenant. Landlord, in its sole discretion, shall have the right to reject any contractor or subcontractor. Without limiting the foregoing, Tenant acknowledges and agrees that all of its contractors and subcontractors must be licensed, bonded and insured (i.e., with commercial general liability insurance with limits of at least $1,000,000 per occurrence and worker's compensation insurance with the required statutory limits).

(e)     If work is performed by Tenant on parts of the Building that are presently under warranty from other contractors or subcontractors, including but not limited to the roof, heating, ventilating and air conditioning systems, electrical and sprinkler systems, such work shall be done by Landlord's contractor or subcontractor who is responsible under the applicable warranty at Tenant's expense.

(f)     Upon completion of any work by or on behalf of Tenant, Landlord's architect shall inspect the Demised Premises to insure that the work has been performed in accordance with the approved Plans and Specifications. Upon acceptance of the work by Landlord's architect, receipt of lien waivers from all contractors and subcontractors who performed work on the Demised Premises, paid receipts or other evidence substantiating the actual costs of the work done and the issuance of a certificate of occupancy, Landlord will reimburse to Tenant the actual documented cost of the work done and paid for by Tenant, up to the maximum amount of the Allowance, if any.

(g)     Without limiting any other provision of this Lease, Tenant shall hold Landlord harmless from and indemnify Landlord against any and all liability, costs, expenses (including without limitation reasonable attorney's fees), claims, demands, or causes of action for damage to persons or property arising out of or in connection with the work performed by Tenant, its employees, agents, contractors and subcontractors.

**Signatures on Following Page**

LANDLORD:  ErinWay Partners, L.P.

By:  Loeb Realty Co., Inc., General Partner

By: _____
     Louis Loeb, Secretary/Treasurer

TENANT:  Holiday Ham and Turkey, Inc.

By: _____

Name: _Lucius D. JoRDAN III_____

Title: _PresideNT_____

# ERINWAY PARTNERS, L.P.

# THIRD AMENDMENT TO LEASE

Whereas, **ErinWay Partners, L.P., as successor in interest to White Station Partners, L.P.**, as Landlord, and **Holiday Erin, LLC, as successor in interest to Holiday Ham and Turkey, Inc.**, as Tenant, did enter into a Lease dated **July 8, 1998, as amended,** for approximately **4,842 (originally 3,825)** square feet of space located at **585 Erin Drive**; Memphis, Tennessee, and

Whereas, both Landlord and Tenant desire to change and modify the Lease for the mutual benefit of both parties, Landlord and Tenant agree to make the following changes and modifications to the Lease:

    1. **TERM**:   The Term of the Lease shall be extended sixty (60) months for a new Lease Expiration Date of May 31, 2014.  This term extension shall be an exercise of Tenant's 1st option to renew per the Rider to the Lease.

    2. **MINIMUM GUARANTEED RENTAL**:   Effective June 1, 2009, the Minimum Guaranteed Rental shall be $19.06 per rentable square foot, or $7,690.71 per month.  Effective June 1, 2011, the Minimum Guaranteed Rental shall increase to $20.00 per rentable square foot, or $8,070.00 per month.

    3. **IMPROVEMENT ALLOWANCE**:   Landlord will provide Tenant an Improvement Allowance for the improvements described on Exhibits A, A-1, and A-2 per the conditions of the attached Improvement Addendum, which shall be further secured by a Promissory Note.

All improvements described on the attached Exhibits, or otherwise, are subject to Landlord's final written approval.

    4. **OTHER TERMS AND CONDITIONS**:   All other terms and conditions as set forth in the Lease will remain in full force and effect, and no other changes to the Lease, except as set forth above are agreed to by Landlord and Tenant.

**This Amendment to the Lease will become effective when signed by all parties below.**

Accepted and Agreed to by both Landlord and Tenant this _16th_ day of _January_, 2008.

**LANDLORD: ErinWay Partners, L.P.**

By: Loeb Realty Co., Inc., General Partner

By: _____
    **Louis Loeb, Secretary/Treasurer**

**TENANT: Holiday Erin, LLC**

By: _____

Name: _Lucius D. Jordan III_

Title: _____

# ERINWAY PARTNERS, L.P.

# FOURTH AMENDMENT TO LEASE

Whereas, **ErinWay Partners, L.P., as successor in interest to White Station Partners, L.P.**, as Landlord, and **Holiday Ham and Turkey, Inc.**, as Tenant, did enter into a Lease dated **July 8, 1998, as amended**, for approximately **3,825 square feet** of space located at **585 Erin Drive**; Memphis, Tennessee, and

**Whereas, by the Amendment to Lease dated May 27, 2004, the Demised Premises was expanded by 197 square feet for a new square footage totaling 4,022; and**

**Whereas, by the Second Amendment to Lease dated August 29, 2006, the Demised Premises was expanded by 820 square feet for a new total of 4,842 square feet; and**

**Whereas, the Lease was assigned to Holiday Erin, LLC by Assignment of Lease and Agreement dated January 16, 2007; and**

Whereas, both Landlord and Tenant desire to change and modify the Lease for the mutual benefit of both parties, Landlord and Tenant agree to make the following changes and modifications to the Lease:

　　1. **LEASE TERM**: The Lease Term shall be extended sixty (60) months for a new expiration date of May 31, 2019. The Lease Term extension stated in this paragraph shall operate as an exercise of Tenant's second option to renew per the Rider to Lease.

　　2. **MINIMUM GUARANTEED RENTAL**: Effective June 1, 2015, the Minimum Guaranteed Rental shall increase to $21.00 per rentable square foot, or $8,473.50 per month.

　　3. **RENEWAL OPTION**: Tenant (but not any subtenant or assignee of Tenant) shall have the option to renew the Lease for up to one (1) additional renewal term. The renewal term shall be for a period of sixty (60) months. Annual Minimum Guaranteed Rental during the renewal term shall be adjusted to the fair market value of comparable retail space, but in no event shall the adjusted rental be less than a ten percent (10%) increase in the previous period's Minimum Guaranteed Rental. The adjusted Rental due is to be mutually agreed upon by both Landlord and Tenant. Except for such increases in annual Minimum Guaranteed Rental (and limitation of Tenant's renewal option(s) to the number set forth above), Tenant's occupancy of the Demised Premises during any renewal term shall otherwise be on the same terms and conditions as are set forth in this Lease. If Tenant desires to exercise any renewal option, it must do so by delivering written notice of such exercise to Landlord at least one hundred eighty (180) days, but not more than two hundred seventy (270) days, prior to the expiration of the then-current term of this Lease, time being of the essence. During any renewal term, Landlord shall lease to Tenant the Demised Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g. moving allowance, outside brokerage fees, construction allowance, and the like) or other tenant inducements. Notwithstanding any other provision contained in the Lease to the contrary, Tenant's right under this paragraph shall terminate if (1) this Lease or Tenant's right to possession of the Premises is terminated, (2) Tenant assigns any of its interest in this Lease or sublets any portion of the Premises to any other person or entity, (3) Tenant ever defaults under the Lease, or (4) Tenant fails to timely exercise its options.

　　4. **CONTINGENCY**: The terms of this Fourth Amendment to Lease are contingent upon Landlord's receipt of payment in full of the current principal balance of the following Promissory Notes within thirty (30) days of the full execution of this Fourth Amendment to Lease:

a)  Promissory Note dated July 3, 2008 for $170,000.00 under the Lease hereof; and
b)  Promissory Note dated November 1, 2007 for $229,412.00 (two (2) amortizations $168,481.00 + $60,931.00) under the Lease by and between Loeb Bros. Realty, L.P. and Holiday Midtown, LLC for premises located at 2087 Union Avenue; and
c)  Promissory Note dated July 11, 2012 for $191,522.00 under the Lease by and between Loeb Bros. Realty, L.P. and Holiday Midtown, LLC for premises located at 2087-2091 Union Avenue.

5. **CROSS DEFAULT**:  Without limiting any other provision of the Lease or this Fourth Amendment to Lease, Tenant agrees that (a) any default by Tenant or any of its Affiliates (defined below) under any Other Tenant Obligations shall also be deemed to be a default by Tenant under the Lease, and (b) any default by Tenant under the Lease shall also be deemed to be a default by Tenant or (where applicable) its Affiliates under all Other Tenant Obligations.  For purposes hereof, the "Other Tenant Obligations" shall mean and include any and all obligations now or hereafter owing from Tenant or any of its Affiliates to Landlord or any of its Affiliates under any lease (other than the Lease), promissory note, guaranty, indemnity agreement or other agreement or undertaking of any kind or nature whatsoever, whether now or hereafter existing.  For purposes hereof, an "Affiliate" shall mean, as to a specific person or entity, a person or entity that directly or indirectly controls, is controlled by, or is under common control with such person or entity.

6. **OTHER TERMS AND CONDITIONS**:  All other terms and conditions as set forth in the Lease will remain in full force and effect, and no other changes to the Lease, except as set forth above are agreed to by Landlord and Tenant.

**This Amendment to the Lease will become effective when signed by all parties below.**

Accepted and Agreed to by both Landlord and Tenant this _15_ day of _November_ 2012.

**LANDLORD:  ErinWay Partners, L.P.**

By: Loeb Realty Co., Inc., General Partner

By: _____
~~Louis Loeb, Secretary/Treasurer~~
Earl Williams Jr. SeVP

**TENANT:  Holiday Erin, LLC**

By: _____

Name: _Lucius D. Jordan III_

Title: _President_

DocuSign Envelope ID: 25B99374-9429-45DC-8B45-798F27CA288D

# ERINWAY PARTNERS, L.P.

# FIFTH LEASE AMENDMENT

THIS LEASE AMENDMENT ("Amendment") is made on ___4/26/2019_____ by and between ErinWay Partners, L.P., with a mailing address of P.O. Box 171247, Memphis, Tennessee, 38187, successor to White Station Partners, L.P ("Landlord"), and Holiday Erin, LLC, with a mailing address of 5885 Ridgeway Ctr. Pkwy., #110, Memphis, Tennessee, 38120, successor by assignment from Holiday Ham and Turkey, Inc. ("Tenant").

WHEREAS, Landlord and Tenant are parties to a Lease dated July 8, 1998, as amended, for approximately 3,825 rentable square feet located at 585 Erin Drive, Memphis, Tennessee (the "Lease");

Whereas, by the Amendment to Lease dated May 27, 2004, the Demised Premises was expanded by 197 rentable square feet for a new area of 4,022 rentable square feet;

Whereas, by the Second Amendment to Lease dated August 29, 2006, the Demised Premises was expanded by 820 rentable square feet for a new area of 4,842 rentable square feet;

WHEREAS, the current Lease Term expires May 31, 2019; and

WHEREAS, Tenant desires to exercise the renewal option described in the Fourth Amendment to Lease and Landlord agrees to accept such exercise as described herein;

NOW THEREFORE, Landlord and Tenant, intending to be legally bound, agree to make the following changes and modifications to the Lease for the mutual benefit of both parties.

1. <u>Recitals.</u>  The recitals above are incorporated by reference as if copied verbatim herein.

2. <u>Lease Term.</u>  The Lease Term will be extended 60 months from June 1, 2019 through May 31, 2024.  This Amendment will operate to replace Tenant's option to renew the Lease as described in Paragraph 3 of the Fourth Amendment to Lease.  During the extended Lease Term, Landlord will lease to Tenant the Demised Premises in its then-current condition and will not provide to Tenant any allowances (e.g. moving allowance, construction allowance, and the like) or other tenant inducements, except as stated herein.

3. <u>Minimum Guaranteed Rental.</u>  Effective June 1, 2019, Minimum Guaranteed Rental will increase to $25.00 per rentable square foot ($10,088.00/month).

4. <u>Heating and Air Conditioning.</u>  Landlord's approved heating and air conditioning manufacturers are Carrier and Trane.  From the date hereof, no other manufacturers' equipment may be installed on the Demised Premises.

5. <u>Renovation and Re-branding.</u>  Tenant will re-brand the business operated in the Demised Premises from Holiday Deli & Ham to Pimentos Kitchen + Market.  Tenant will perform improvements to the Demised Premises, which will include interior and exterior re-branding (the "Tenant's Work"), subject to the prior written approval of Landlord.  Tenant will perform the Tenant's Work per the terms and conditions of <u>Exhibit A</u> attached hereto and incorporated herein.

6. <u>Renewal Options.</u>  Tenant (but not any subtenant or assignee of Tenant) will have the option to renew the Lease for two additional renewal terms of 60 months each.  Annual Minimum Guaranteed Rental during each renewal term will be adjusted to the fair market value of comparable retail space, but in no event shall the adjusted rental be less than a 10% increase in the previous period's Minimum Guaranteed Rental.  The adjusted Rental due is to be mutually agreed upon by both Landlord and Tenant.  Tenant's occupancy of the Demised Premises during any renewal term will be on the same terms and conditions as are set forth in the Lease, except that during any renewal term (i) Minimum Guaranteed Rental will increase as set forth above; (ii) Tenant's renewal option will be limited as set forth above; and (iii) Landlord will lease to Tenant the Demised Premises in their then-current condition, and will not provide to Tenant any allowances (e.g. moving allowance, outside brokerage fees, construction allowance, and the like) or other tenant inducements.  If Tenant desires to exercise any renewal option, it must do so by delivering written notice of such exercise to Landlord at least one 180 days, but not more than 270 days, prior to the expiration of the then-current term of this Lease, time being of the essence.  Notwithstanding any other provision contained herein to the contrary, Tenant's right under this paragraph will terminate if (i) the Lease or Tenant's right to possession of the Demised Premises is terminated, (ii) Tenant assigns any of its interest in the Lease or sublets any portion of the Demised Premises to any other person or entity, (iii) Tenant ever defaults under the Lease, or (iv) Tenant fails to timely exercise its options under this Paragraph.

7. <u>Limited Guaranty.</u>  The Limited Guaranty of the Lease, executed and delivered by Lucius D. Jordan, III and attached hereto as <u>Exhibit B</u>, is made a part of the Lease.

8. <u>Sales Reporting.</u> In addition to any other reports or financial statements required to be provided by Tenant under the Lease, within fifteen (15) days of Landlord's written request, Tenant will furnish Landlord annual statements of gross sales and business transacted in the Demised Premises for the preceding calendar year. Landlord agrees that the terms of this Section describe confidential information, and Landlord agrees not to disclose such confidential information to any person or entity.

9. <u>Other Terms and Conditions.</u> All other terms and conditions set forth in the Lease will remain in full force and effect, and no other changes to the Lease, except as set forth above, are agreed to by Landlord and Tenant.


IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment on the date first written hereinabove.


Landlord: ERINWAY PARTNERS, L.P.
By: Loeb Realty Co., Inc., General Partner

By: _Louis S. Loeb_
    C3D2EAEFB2D146B...

Printed Name: Louis S. Loeb

Title: Sec-Tres Loeb Realty Co. Inc.


Tenant: HOLIDAY ERIN, LLC

By: _Lucius D. Jordan, III_
    0F06AB0B2CDC401...

Printed Name: Lucius D. Jordan, III

Title: President


Limited
Guarantor: _Lucius D. Jordan, III_
           0F06AB0B2CDC401...
           LUCIUS D. JORDAN, III

DocuSign Envelope ID: 25B9337A-9329-456C-8D32-76F27EA68F1C

EXHIBIT A

1. Tenant is currently in possession of and operates in the Demised Premises. In no event will Landlord be liable for any expense resulting from Tenant's use or installation on the Demised Premises of any Tenant-specific improvements, including but not limited to Tenant improvements that increase electrical, plumbing, climate control, or ventilation loads, or require structural improvement or reinforcement.

2. <u>Tenant's Work.</u>  Upon execution of the Fifth Lease Amendment, Tenant agrees to proceed with due diligence to perform the following "Tenant's Work":

   (a) subject to the provisions herein, any work required to prepare the Demised Premises to accommodate Tenant's re-branding or renovation of the Demised Premises.

3. <u>Tenant's Work Requirements.</u>

   (a) Tenant, at Tenant's sole cost and expense, will obtain all permits, variances, or other governmental approval required prior to commencement of any construction. Upon executing this Amendment, Tenant will proceed with diligence to procure any such governmental approval.

   (b) For any new construction or alterations on the Demised Premises, Tenant may use only metal studs spaced at no less than 16" on center for wall construction, only copper pipe for supply-line plumbing, only smooth finishes for all interior walls, and only HVAC equipment manufactured by Carrier or Trane.

   (c) Any Tenant's Work causing venting, opening, sealing, waterproofing, or any altering of the roof will be performed by Landlord's roofing contractor at Tenant's expense. Tenant will provide Landlord with a certificate from Landlord's roofing contractor that all of Tenant's Work causing venting, opening, sealing, waterproofing or in any way altering the roof has been performed in compliance with the below-defined Plans and Specifications. Tenant hereby holds Landlord harmless from any damage to the Demised Premises resulting, directly or indirectly, from Tenant's venting, opening, sealing, waterproofing or in any other way altering the roof unless such a certificate from Landlord's roofing contractor has been delivered to Landlord before the date of any such loss. In the event of any dispute as to work performed by Landlord or Tenant, the certificate of Landlord's architect or engineer will be conclusive.

4. <u>Plans and Specifications.</u>  All the following information ("Plans and Specifications") must be approved in writing by Landlord prior to the commencement of Tenant's Work, or any other Tenant alterations or improvements on the Demised Premises:

   (a) fully engineered electrical, plumbing and mechanical plan;

   (b) where applicable, fully engineered kitchen plan including electrical, gas and water load; and

   (c) plans and specifications for any other alterations that Tenant may desire to make upon the Demised Premises.

   All work performed by or on behalf of Tenant will be performed in conformance with such approved Plans and Specifications in a good and workmanlike manner and in compliance with all applicable laws, rules, codes, ordinances and regulations. Landlord has the right to require Tenant, at its sole expense, to remedy any failure to comply with the requirements of this Paragraph 4, including but not limited to substandard or inadequate methods of construction.

5. <u>Contractor Approval.</u> Tenant will provide Landlord with a complete list of contractors and subcontractors who will be performing work in or on the Demised Premises on behalf of Tenant. Landlord, in its sole discretion, will have the right to reject any contractor or subcontractor. Without limiting the foregoing, Tenant acknowledges and agrees that all of its contractors and subcontractors must be licensed, bonded and insured with both (i) commercial general liability insurance with limits of at least $1,000,000 per occurrence and (ii) worker's compensation insurance with the limits required by Tenn. Code Ann. § 50-6-405, as may be amended from time to time, and any other applicable federal or state law. Tenant's contractors and subcontractors will execute a Waiver of Lien and/or a Contractor's Acknowledgement, and Tenant will deliver the same to Landlord.

6. <u>Warranties.</u>  If work is performed by Tenant on parts of the Building that are presently under warranty from other contractors or subcontractors, including but not limited to the roof, heating, ventilating and air conditioning systems, electrical and sprinkler systems, such work will be done by Landlord's contractor or subcontractor who is responsible under the applicable warranty at Tenant's expense.

7. <u>Finish Reimbursement.</u>

   (a) Provided Tenant is never in default on the Lease, Landlord will furnish to Tenant a finish reimbursement of up to $24,210.00 (the "Reimbursement") toward the completion of the Tenant's Work in the Demised

DocuSign Envelope ID: 25B9374A-9429-45DC-9E39-708F27C7A88D

Premises.  Notwithstanding any mention of such items in the Tenant's Work above, no expenses for the purchase and/or installation of tangible, personal property and/or inventory (including without limitation Tenant's furniture, fixtures, equipment, trade fixtures, and signage) will be paid with the Reimbursement.  Further, Landlord and Tenant agree that the Reimbursement stated above was agreed upon as a pro-rata portion of the total cost of Tenant's renovation, which renovation shall include the Tenant's Work plus the cost of the purchase and/or installation of tangible, personal property (including without limitation Tenant's furniture, fixtures, equipment, trade fixtures, and signage), together being the "Total Renovation Costs," as estimated by Tenant, and the Reimbursement shall not exceed 33.33% of the Total Renovation Costs.  Landlord and Tenant agree that if the actual final cost of the Total Renovation Costs is less than $72,637.26, then the Reimbursement will be reduced on a pro-rata basis so that upon completion and calculation of the actual final Total Renovation Costs, the Reimbursement shall be an amount equal to, but no more than, 33.33% of the actual final Total Renovation Costs.  In no event will the Reimbursement be an amount more than $24,210.00.

(b)  Upon completion of any work by or on behalf of Tenant, Landlord's construction manager will inspect the Demised Premises to ensure that the work has been performed in accordance with the approved Plans and Specifications.  Upon acceptance of the work by Landlord's construction manager, receipt of lien waivers from all contractors and subcontractors who performed work on the Demised Premises, paid receipts or other evidence substantiating the actual costs of the work done and the issuance of a certificate of occupancy, Landlord will reimburse to Tenant the actual documented cost of the work done and paid for by Tenant, up to the maximum amount of the Reimbursement, if any.

8.  Indemnity.  Without limiting any other provision of the Lease, Tenant will hold Landlord harmless from and indemnify Landlord against any and all liability, costs, expenses (including without limitation reasonable attorney's fees), claims, demands, or causes of action for damage to persons or property arising out of or in connection with the work performed by Tenant, its employees, agents, contractors and subcontractors.

9.  Construction Management Fee.  If Tenant changes the scope of the construction in the Demised Premises to the extent that Landlord's construction manager is required to devote substantial additional time and/or effort to the project, Tenant will reimburse Landlord's expense for such excess time and/or effort.

DocuSign Envelope ID: 25B9337A-9429-45BC-9C3C-768F27C7F88D

EXHIBIT B

Limited Guaranty

Lucius D. Jordan, III ("Guarantor"), who is the ___President___ of Tenant, jointly and severally (if more than one), hereby unconditionally and absolutely guarantees to Landlord the full and prompt payment when due of all sums now or hereafter payable by Tenant to Landlord pursuant to the terms of the Lease, including, without limitation, all rent, additional rent, and all other sums, fees and charges of every description payable by Tenant under the terms of the Lease (collectively, the "Rents"), and the full and prompt performance of all obligations, covenants, and conditions to be observed and performed by Tenant under the terms of the Lease.  If at any time Tenant will default in the payment of any Rents, or in the performance and observance of any of the obligations, covenants and conditions set forth in the Lease, Guarantor will immediately pay such Rents to Landlord, and will immediately and faithfully perform and fulfill all of such obligations, covenants and conditions, and also will pay to Landlord all damages that may arise in consequence of any default by Tenant under the Lease, including, without limitation, all reasonable attorney's fees and expenses suffered or incurred by Landlord and resulting from, incident to, or otherwise arising out of or in connection with a default by Tenant under the Lease, or the enforcement of the Lease or the enforcement of this Guaranty.

This Guaranty will be a continuing guaranty, and the liability of Guarantor hereunder will not be affected, modified or diminished  in any way by reason of (a) any modification, amendment, assignment, subletting, extension or renewal of the Lease; (b) any release, compromise or indulgence now or hereafter granted by Landlord with respect to the Lease, or to any person or entity now or hereafter liable thereunder or hereunder; (c) any consent, actions, inaction or omission under or in respect of the Lease; (d) any bankruptcy, insolvency, reorganization, liquidation, arrangement, assignment for the benefit of creditors, receivership, trusteeship or similar proceeding affecting Tenant; or (e) the assertion or the failure to assert by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the Lease, or which otherwise may be available to a landlord at law or in equity.

This Guaranty is an absolute and unconditional guaranty of payment and performance of all obligations of Tenant to Landlord under the Lease, and not of collection.  The liability of Guarantor under the Guaranty will be direct and immediate and not conditioned or contingent upon the pursuit of any remedies against Tenant or any other person. Guarantor expressly agrees that this Guaranty will be enforceable against Guarantor without the necessity of any suit or proceeding on Landlord's part of any kind or nature whatsoever against Tenant and without the necessity of any notice of nonpayment, nonperformance or nonobservance or any notice of acceptance of this Guaranty or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives.  In the event of a default under the Lease or this Guaranty, Landlord will have the right to enforce its rights, powers and remedies thereunder or hereunder in any order, and all rights, powers and remedies available to Landlord in such event will be nonexclusive and cumulative of all other rights, powers and remedies now or hereafter provided thereunder or hereunder or by law or in equity; and no exercise or partial exercise of any such right or remedy under the Lease or this Guaranty is or will be construed to be exclusive of or a waiver of any other right or remedy.  No delay on the part of Landlord in exercising any right, power or privilege under the Lease or this Guaranty, or failure to exercise the same, will operate as a waiver of or otherwise affect any such right, power or privilege, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  If the obligations guaranteed hereby are partially paid or performed, this Guaranty will nevertheless remain in full force and effect, and the Guarantor will remain liable for the entire unpaid balance of the Rents and the performance of all other obligations of Tenant guaranteed hereby, even though any rights which Guarantor may have against Tenant may be destroyed or diminished by the exercise of any such remedy.  Until all of the obligations of Tenant to Landlord under the Lease have been paid and performed in full, Guarantor will have no right of subrogation to the Landlord against Tenant, and Guarantor hereby waives any rights to enforce any remedy which Landlord may have against Tenant.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by Landlord or any officer or agent of Landlord, except by a writing signed by a duly authorized officer of Landlord; nor will any such release or waiver be applicable except in the specific instance for which given.  This Guaranty will be irrevocable by Guarantor so long as the Lease will remain in effect and until all obligations guaranteed hereby have been paid and performed in full in accordance with the terms of the Lease.

This Guaranty will be governed and construed in accordance with the laws of the State of Tennessee.  Guarantor hereby submits to personal jurisdiction in the State of Tennessee for the enforcement of this Guaranty, and waives any and all personal rights under the law of any state to object to jurisdiction within such State for the purposes of litigation to enforce this Guaranty.

The liability of Guarantor hereunder is co-extensive with that of Tenant under the Lease, and with any other guarantor who may have guaranteed or who hereafter may guarantee the obligations of Tenant under the Lease, and Landlord may release or settle with any one or more such guarantors at any time or from time to time without affecting the continuing liability of Guarantor hereunder.  This Guaranty will in no event be impaired by any change which may arise by reason of the dissolution, liquidation or merger of Tenant, if a corporation or partnership, or the death of Tenant or Guarantor, if individuals.

**Notwithstanding anything to the contrary contained hereinabove, the total liability of Guarantor hereunder will be limited to and will not exceed the "Guaranty Limit," which shall be the sum of (a) the finish Reimbursement of $24,210.00 provided to Tenant and described in <u>Exhibit A</u>, attached hereto, plus (b) the leasing commission of $12,105.60 paid by Landlord to Tenant's broker, plus (c) the leasing commission of $12,105.60 paid by Landlord to Landlord's broker, for a grand total of the Guaranty Limit as $48,421.20.  Notwithstanding the foregoing limitation, this Guaranty is a continuing, absolute and unconditional guaranty.**

Guarantor has caused this Guaranty to be executed as of the date of the attached Fifth Lease Amendment, of which this Guaranty is a part.

LIMITED GUARANTOR:

DocuSigned by:

*Lucius D. Jordan, III*

Lucius D. Jordan, III